May it please the court, Davina Chan on behalf of Hector Ruiz-Bernal, I'd like to reserve two minutes for rebuttal. Not all facts are suspicious. Arvizo and Valdez-Vega do not require that all factors be given weight, much less substantial weight. What those cases require is that all facts be viewed in context. And when the facts of this case are viewed in the context of the totality of the circumstances, there was no reasonable suspicion. In fact, it's the government's position in this case that requires the court to view each fact in isolation, out of context, and then to perform an act of addition. For example, the government submits that driving on the freeway with all the windows open is suspicious. On a cold, damp day. On a cold, damp day. What's very interesting about this case, though, is that later in the hearing, the government conceded that it had been raining earlier that day, but it was not raining now. I would submit that I understand that the agents are not required to think about every reasonable explanation. But if you're smoking in your car, and it's been raining, so you have to have all the windows up, and now it's stopped raining, and you put the windows down, that is not suspicious. Driving in your car with the windows down right before you... Yes, they knew he was smoking. That was the first thing that they noticed, was that he was smoking. And so I agree. If he were just riding around with the windows down in a winter coat, that might be suspicious. He was in light clothing. He had no jacket. It didn't appear that he intended to drive in the fast lane with all the windows down, as the government... Do we know what the temperature was? You know, I looked online, and I couldn't find any indication of exactly... I'm not very good at that. The government didn't submit any information as to what the exact temperature was. It was morning, and it had been raining earlier that day. It was October. In California, that could mean it was very hot, or it could mean that it's very cold. But what we know is that they were driving... So it's true in other parts of the country, too. Not all parts of the country. I suppose. So the government submits that many drug smugglers drive with all their windows open. If he knew he was going to be driving with all his windows open, presumably he would be wearing a jacket. But the government says it's also suspicious that he wasn't wearing a jacket. You know, if you read all these immigration cases, as I'm sure you have, you'll find it's suspicious if you do have a jacket or you don't have a jacket, if it's cold or if it's warm, if you're driving too fast or too slow. If you haven't gotten discouraged with your argument by now, I applaud you for your enthusiasm. Well, what I think what I'm saying is that to the extent that this Court has said that you have to view everything in context, what that means is you have to look at all the factors together. So if someone's not wearing a jacket, that might indicate that they didn't expect to be driving in the fast lane with all the windows open. I would submit that that factor is entitled to very little weight. Assuming we could find from a source of, that we could take judicial notice of what the temperature was on that day at that time, would that not be relevant? I suppose it would be relevant. If it was, say, 40 degrees, why would he have all the windows open? I think if it were 40 degrees, the reason he would have all the windows open is because it had recently been raining and he was smoking. And when you smoke, you get a lot of smoke in your car. And when it stops raining, it's time to get the smoke out of your car. So yes, it's true. That's a possibility, but that's certainly not the only plausible possibility, is it? No, it's not the only plausible possibility. So it's a question of whether this particular fact is very probative or just a little bit probative. And I don't think that any case requires the court to say that it's very probative. So maybe it's a little bit probative. But we know that they couldn't pull him aside because he was driving with all his windows open. That wouldn't have been enough, right? I don't think even the government submits that that would have been enough. So let's see what else they have. He was driving on the I-15. Okay, there are two freeways that go north, south, and southern California. He was driving on one of them. I would submit that that is not probative. The government says that the court found it probative in Valdez Vega. But in Valdez Vega, we had erratic driving right at the Temecula checkpoint. Very, very different case. What else does the government have? He reduced his speed. That's an interesting fact because one of the agents said that's significant because drug smugglers reduce their speed so that you cannot see into their car. But the other agent said when he reduced his speed, we were behind him. So it wouldn't affect whether they could see in his car or not. I mean, it's not relevant to the analysis, but as we know, the drugs weren't found in his car. They were found under his car. So this idea that because they found drugs, that shows that that's why he was driving with the windows open and that's why he reduced his speed is specious, right? Because the drugs were not in the car. They were under the car. But in any event, the reduction of speed to me, I think, is significant for another reason, though. Again, we need to look at all the factors together. The government argues that the normal motoring public ignores Border Patrol. Now, whether we believe that or not, the government argued it. The agents argued it. They did not testify that the normal motoring public ignores Border Patrol, even when Border Patrol is clearly following them. In this case, the reduction of speed also caused Border Patrol to reduce their speed. Everyone else was going around them. Border Patrol and Mr. Valdesvega's Jetta, by the way, not a minivan or a truck or anything else that the government generally says is used for drug smuggling, in his Jetta, now is being followed closely by Border Patrol. Anyone who is being followed by a law enforcement officer, whether they be a member of the general motoring public or a drug smuggler, becomes preoccupied. They want to see if they're being pulled over. You look at them to see if their lights are on. If their lights are on, I'm going to have to pull over. If their lights aren't on, I'm not going to have to pull over. So the reduction of speed is significant. But it's significant for a different reason than the government submits. It's significant because the Jetta's reduction in speed allowed Mr. Ruiz to know that someone was following him. And when you know law enforcement is following him, your subsequent staring at law enforcement, as I said, such as the extent that he veered towards the median, is not suspicious. What about the alert from the Treasury Enforcement Customs System? I think the alert is very interesting. And what the district court found was that the alert indicated that the car had cleared secondary inspection that morning. And that finding was not clearly erroneous. If you listen to the tape, it says, I have a quote because I listened to it myself, all secondaries through POE negative inspection. That's all secondaries through the point of port of entry are negative inspection. What we know from Cotterman and several other cases from the circuit is that when you have a text alert on you, you're automatically referred to secondary inspection. The officers knew that he crossed the border that morning. That's what the text alert said. So the officers also knew that it had gone through secondary inspection that morning. Now, the agent's testimony as regards to this is totally problematic and inconsistent. One of the agents said that he could tell from the dispatch that it hadn't been searched that morning. There was absolutely nothing in that dispatch which indicated that that car had not been searched that morning. And that fact, standing alone, really gives rise to questions about the credibility of these agents. They say they relied on the text alert, and the text alert says it crossed the border this morning, all secondaries through POE negative inspection. But one of the agents testified that he could tell from the dispatch that it had not been searched that morning. The other agent said he didn't know whether it had been searched that morning. But you know how easy it would have been for him to find out? A follow-up question, was it searched that morning? They did not ask the follow-up question, because they did not value the Fourth Amendment. This is not a matter of micromanaging Border Patrol, but they have to understand that the Fourth Amendment means something. If the text alert comes in and they say it crossed the border this morning, and all secondaries through POE negative inspection, why not ask, was it searched today? Because if it was searched today, that dissipates reasonable suspicion. If it went through a secondary inspection with a canine sniff, et cetera, today, that will dissipate reasonable suspicion. They didn't ask. In fact, they didn't even testify about the negative secondary that came out in cross-examination. So I really think that while a text alert might add something in some cases, and I wouldn't even say that a text alert adds much in most cases, because this is not like an NCIC. An NCIC says there's a warrant out for someone. There's no warrant out here. Somebody said something was suspicious.  And what we know is at the border, no reasonable suspicion is required at all. So the standard to get a text alert is extremely low. It need not reach reasonable suspicion, because no reasonable suspicion is needed at the border. And that is the fifth and only factor that the government relies on. If the court has no further questions, I see that I'm past my time. Thank you very much. We'll give you another minute for rebuttal, if you want. Good morning, and may it please the Court. Mark Yohalam on behalf of the United States. I want to start by just clarifying some questions about the record that arose. There is direct testimony about the temperature from the agents who say that it was very cold that day. That's at excerpts of record 51. It's very cold. I mean, is there a temperature number given to us? Well, what the no, a temperature number wasn't given. I don't think that's required. But what the agents also say is that all the windows being rolled down on the car stood out compared to all the other windows on the road, and that's at excerpts of record 54. Now, the defendant has offered sort of an interesting explanation for how if he had been smoking earlier with the windows rolled up, maybe that would be why he would roll down all the windows on a cold day. But that's exactly the kind of innocent explanation, and in fact somewhat far-fetched innocent explanation, that this Court is not entitled to replace the agent's reasonable suspicion with. Second, my opponent said that the agents were inconsistent about their testimony about when the defendant reduced his speed. That is not my reading of the record. At excerpts of record 10 and 15, both of them say that he reduced his speed when they pulled up alongside him, not when they were behind him. As to whether other vehicles on the road treat Border Patrol, respond to Border Patrol by reducing their speed, in fact, the record shows that they do not reduce their speed, because after the defendant reduced his speed, and the Border Patrol vehicle did as well, other cars started passing them on the right. So if ordinary California drivers become nervous around Border Patrol and reduce their speed, that would not have happened. The fact that they're not merely not reducing their speed but illegally making a pass on the right strongly supports what the agents testified, and the agents were not ever found incredible by the district court, which is that normally drivers basically drive the way they would, but that smugglers respond nervously to the Border Patrol. They reduce their speed to try to get farther back so that they can't be observed, their vehicle can't be observed, and that they become rigid, that they become fixated upon the agents and will sometimes lose track of where they are, all behaviors that defendant showed here. Who becomes rigid? That smugglers will become nervous when they see a Border Patrol vehicle, that they respond to that by becoming rigid and by not looking at the Border Patrol, and that then when they believe they can sort of observe the Border Patrol surreptitiously, they may become fixated upon them. Those are behaviors that the defendant showed here. He became so fixated that he drifted out of his lane into the median. Finally, one other just record clarification. Defendant stated... I wonder what the ultimate evidentiary basis is for that alleged syndrome that you've described. The government falls back on here on expertise, but how many such cases would an agent have to see? And I'll bet he wasn't asked that. Well, so he did testify that this was based on behaviors he had observed in the field as well. How many? He didn't say how many. So if he observed maybe five who went that way and 25 who went some other way in terms of this alleged syndrome, should we give that any weight? Or should we view it as a convenient rationalization? I think there are a couple of answers to that question. The first that I would give is that to the extent what Your Honor is driving at is that perhaps the agent merely fabricated that explanation. That is a determination to be made by the district court. No, I'm trying to we see so often this waving of the expertise flag. And it's one thing when you're talking about something fairly narrow and specific, but what's being asserted here is a whole syndrome of behavior that smugglers engage in and no one else does that seems on its face implausible. I'm not sure that the testimony is that no one else does and that all smugglers do it. I think it's based not just on his experience. I don't recall in the DSM the smuggler syndrome being listed in the Bible of psychology. It's an ever-growing manual, so who knows. I don't think it's a syndrome. I think it's common sense that when you're up to no good, you become nervous when there is law enforcement present. So if it's a question of just common sense, that's fine. But then we should not give it any added weight because of alleged expertise. Then we should simply say was this a plausible inference for anyone to draw or not? No, I don't think that's right, Judge Rakoff. And maybe I wasn't clear in my response. I think these officers who between them have about 10 years' experience, had 10 years' experience at the time of this stop and had gone through training in interdicting smugglers, no doubt based on their own experience and what they learned in their training had been told about behaviors that smugglers exhibit. And what they testified to is that these behaviors were behaviors that smugglers exhibit, both based on their training and their expertise. What I understood your response to that to be was that, well, I'm not really buying it. Forgive me for interrupting, but I don't think you can have it both ways. If the argument is this is common sense, fine. Then we give it whatever weight common sense would give it, but we don't add any weight from expertise. If there's an assertion of expertise, it's because there's some element here that does not accord with common sense. That would be the only reason for saying, well, while most people would do X, smugglers do something different because of some unique observable characteristic that we have observed repeatedly, as to which there's really sparse evidence in this record. Again, I guess I disagree with Your Honor, and I apologize for having to disagree with you. But I think something could be both. I'm used to it with a wife and three daughters. The wife and two daughters I also am used to being disagreed with. But no, I think something can be both commonsensical and a matter of expertise. If your doctor says to you, has your heart, have you had chest pains, and you say yes, and he says, well, I'm concerned about your heart, okay, you can't then say, well, so am I. I don't see why I should give you any deference just because you're a heart specialist. Everyone knows if you have chest pains, it could be a problem with your heart. That is something that is both a matter of expertise and common sense. I was bringing common sense in in response to what I may have misunderstood your point to be, which was that I don't really buy what these officers testified to. They were found credible, and their credibility really isn't in question, because what they were testifying to is logical. What do you say about your adversary's point that the tech alert indicated that nothing had been found on the search, but the officers testified differently? Well, I disagree with defense counsel about what the recording says. I mean, the recording does not give a date of when the search occurred. And both of the officers testify consistently that it doesn't say that a search occurred that day. And in fact, defense counsel, during the suppression hearing, what she said is, look, maybe the stop didn't occur that day, but on a prior day. That's at excerpts of Record 58. So that's at excerpts of Record page 58, quoting defense counsel. It was a different defense counsel, that's true. But again, the people who were there at the time, certainly the officers weren't impeached on this fact. Defense counsel today said that the officers failed to mention the negative alert, the negative secondary on direct. That's simply not true. They talk about it at excerpts of Record 36. So I do think the district court clearly erred as to when the negative inspection occurred. It's just not clear when it occurred. And I don't think that the officers failed to follow up on it for some nefarious reason. There were three calls they made to dispatch. The first two were made by Agent Perez. They get back this information in the second call. The third call is that Agent Pinones calls and asks for information, for biographical information about the person who had been associated with the vehicle during the secondary inspections that took place in the past. And there wasn't an answer to it. He said he may have gotten an answer. He didn't recall. It wasn't in the record. But this isn't an issue where for some scheming reason they're trying to avoid finding out an innocent explanation. What Agent Pinones did say was that a prior negative secondary inspection did not give him great comfort for two reasons. One was that what will sometimes happen, and again, this is at excerpts of Record page 45 and 47, I believe, that what will sometimes happen is a smuggler will cross the border repeatedly until they develop a degree of comfort with the inspectors there. And they then think that in the future they will be able to successfully get the drugs through. And here, and just to be clear, I'm not suggesting that reasonable suspicion is supported by the drugs being found in the vehicle. I just want to point out there were 15 kilograms of cocaine in the vehicle. So the idea that a prior secondary inspection is proof that there couldn't possibly be drugs in the vehicle doesn't bear out based on the facts of this case. So what you end up with is that the officers see a car driving down the freeway with all of its windows down on a very cold day. They don't see anyone else driving that way. They think it's odd. They go and they look and they see the person is smoking. They say on testimony, this is excerpts of Record 44, look, if someone has the window down a little bit while they're smoking, nothing odd about that. But what's odd here is that he has all the windows down. We know smugglers do that to filtrate the vehicle to get the smell of drugs out. And I also know that smugglers will smoke to try to mask the smell of drugs. That's even when the windows are down, the cigarette will contribute to masking the smell of drugs. So that makes them somewhat suspicious and they decide they want to pull alongside and just get a look at the situation. In response, the defendant becomes rigid, clutches his steering wheel and stares straight ahead. Then he drops 15 miles an hour until cars have to start passing around them. They say this is not the way ordinary motorists respond to Border Patrol pulling along them. So they pull behind him. And at this point he starts surreptitiously watching them out of the rearview mirror and starts drifting into the median on the highway. At this point, either at this point or perhaps slightly before that point, they make their calls to the dispatcher and they learn that there are multiple text alerts on this vehicle for association with drug smuggling. Reasonable suspicion is not proof beyond a reasonable doubt. As this Court just held in Valdez-Vega, it's a low standard. The question is whether it's reasonable to take some additional investigative step there. And so here I would submit this is like you go to your doctor and you say, I have a shooting pain in my arm, my chest is hurting, and I'm having shortness of breath. The appropriate response is not to say, maybe you have a shooting pain in your arm because you bind into the wall. Maybe you have shortness of breath because you ran up the stairs. And maybe you have pain in your chest because you just got dumped by your girlfriend. I'm sorry, I'm not going to look into this further. The appropriate response is to take some additional modest investigative step. That's all that happened here, and it ended up successfully interdicting 14 kilograms of cocaine. Actually, I think you've just described the typical symptoms of lawyers arguing before the ninth circuit. Thank you, Your Honors. I have a few factual clarifications and then an argument. The first is that there was conflict in the testimony as to where the agents were in relation to the car when it slowed down. On ER 70, Agent Perez testified when it dropped, when the Jetta dropped its speeds, other vehicles were going around us. We were still in the number one lane. So he testified that he was in the number one lane. Do I think that that's the most important fact in the world? No. But I think it is significant, because the reason why dropping speed was supposed to be relevant was because it would get the driver behind Border Patrol. This agent testified that they were behind the driver, so that would not get him behind Border Patrol. So that's the first factual clarification. The second is this discussion of smugglers become nervous. But it's really interesting, because at the same time, the government wants to tell us that smugglers aren't nervous. So at ER 40 and 41, which they quote, Agent Pinones says, oh, well, that negative alert, it meant nothing to me. Because the thing is, is that smugglers, what they do is they cross the border over and over until everyone's comfortable. So when we're deferring to the officer's expertise, it can't be that they're both comfortable and not comfortable. And when they're not comfortable, that's suspicious. But when they're comfortable, that's suspicious also. The third clarification is the government noted that somehow defense counsel below conceded that the secondary alert did not occur that day. That's not true. What happened was after hearing the testimony of the case agent saying, oh, no, the dispatch said that the secondary search occurred a different day, trial counsel said, even if it occurred on a different day, he didn't say it did occur on a different day. And the district court, having heard the recording, as I have and as you can, concluded that the alert, the secondary search had occurred that day. And then finally, it's an argument. It's regarding the smuggler syndrome. I agree. I've seen so many of these cases and there is no evidentiary basis. What if Border Patrol did this? What if they pulled over every single person who was doing the smuggler syndrome? Because they say that gives them reasonable suspicion. And then we could see how many of the ones that were doing the smuggler syndrome had drugs. Then we would have evidentiary basis. It might well violate the Fourth Amendment for all the people who didn't have drugs, because if that was the only thing that they were being pulled over for, but that would provide us with evidentiary basis. This idea that, oh, based on our combined experience of ten years, one of whom was only at the Temecula checkpoint, I think, for four months total. So a combined experience of ten years, one person only at that checkpoint for four months. We know that the general motoring public just goes by us and smugglers always slow down and act rigid. I want to emphasize again, he was acting rigid after Border Patrol was following him. Allowing all the other cars to go past him and following him. We've heard this thing that it's common sense and it's expertise. It's just like when you go to the heart doctor. When you go to the heart doctor, you expect that the heart doctor has gone to medical school. Your method is growing rapidly. There was no reasonable suspicion. Thank you very much. The case just argued will be submitted.
judges: Rakoff, Reinhardt, Clifton